# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

UNIMED INTERNATIONAL INC., d/b/a
Chamonix Skin Care Company, a New
Jersey corporation,

     Plaintiff,

vs.

DERMAGIST, INC., a Florida corporation,
SBM VENTURES LLC, a Florida limited
liability company, and M2 PRODUCTS
GROUP LLC, a Florida limited liability
company, BRADLEY A. MARKIN,
SABRINA MARKIN, ROBERT A.
MARKIN, LORI B. MULTZ, JOHN A.
CATALFAMO;

     Defendants.

**COMPLAINT**

Plaintiff Unimed International Inc., for its Complaint in this matter, states and
alleges as follows:

## PARTIES

1.    Plaintiff Unimed International Inc. ("Unimed"), d/b/a Chamonix Skin
Care Company, is a New Jersey corporation with its principal place of business located at
105 Newfield Avenue, Suite F, Edison, New Jersey 08837.  Unimed markets and
distributes various health and beauty products including products manufactured under the
following trade names:  Chamonix®, Genucel®, Novara, and Esotique®.

2.    Defendant Dermagist, Inc. ("Dermagist") is a Florida corporation with its
principal place of business located at 8140 SE Federal Highway, Hobe Sound, Florida
33455. Dermagist is directly or indirectly owned by Bradley Markin, Lori Multz, and

Sabrina Markin.  On its website (dermagist.com, among others), Dermagist purports to market and distribute "Miracle Cosmeceuticals for Beautiful Skin" under various purportedly registered trade names.  Dermagist's skin care products compete with Unimed's skin care products.

3.      Defendant SBM Ventures LLC ("SBM") is a Florida limited liability company with its principal place of business located at 13223 Marsh Landing, Palm Beach Gardens, Florida 33418. SBM is directly or indirectly owned by Bradley Markin and Sabrina Markin.  Since 2013, SBM has been identified as a managing member of M2 Products Group LLC in documents filed with the Florida Secretary of State.

4.      Defendant M2 Products Group LLC ("M2") is a Florida limited liability company with its principal place of business at 13223 Marsh Landing, Palm Beach Gardens, Florida 33418. M2 is directly or indirectly owned by Bradley Markin, Sabrina Markin, Robert Markin, and SBM. On its websites (skinpeutics.com and healthandskinshop.com, among others), M2 purports to market and distribute various skincare products such as:  Eyevectin®, Eyelighten®, Absolutely Ageless Serum, Corrective Eye Serum, and Calming and Anti-Redness Cream.  M2 also claims to do business at 1562 Park Lane South, Suite 700, Jupiter, Florida 33458 (healthandskinshop.com/health/contact-us/).

5.      Defendant Bradley A. Markin is an individual citizen of Florida domiciled at 13223 Marsh Landing, West Palm Beach, Florida 33418.  Bradley Markin is identified as Dermagist's president, secretary and/or director in annual filings with the Florida Secretary of State from 2011 to the present. In documents filed with the Florida Secretary

of State, Bradley Markin has also been identified a managing member of SBM from 2013 until the present.

6.       Defendant Sabrina Markin, a/k/a, Sabrina Garcia and Melissa Garcia, is an individual citizen of Florida domiciled at 13223 Marsh Landing, West Palm Beach, Florida 33418.   Sabrina Markin and Bradley Markin are wife and husband. Sabrina Markin is a native of Costa Rica.  When registering domain names and conducting other business, Sabrina Markin uses aliases (such as Jorge Rodriguez, Garcia Loaiza Sabrina, Sabrina Garcia, or Melissa Garcia).   She uses these aliases in conjunction with her address in Costa Rica:  P.O. Box 6147, San Jose, Guanacaste, CR. In documents filed with the Florida Secretary of State, Sabrina Markin has been identified a managing member of SBM from 2013 until the present.

7.       Defendant Robert A. Markin is an individual citizen of Florida domiciled at 241 24th Avenue North, Saint Petersburg, Florida 33704.  Robert Markin is Bradley Markin's father. From 2013-2016, Robert Markin was identified as a managing member of M2 in documents filed with the Florida Secretary of State.

8.       Defendant Lori B. Multz, a/k/a Lori Beth Kaplan Multz, is an individual citizen of New York domiciled at 72 Van Houten Fields, West Nyack, New York 10994. In 2006, a federal court in St. Louis, Missouri, charged Lori Mutlz with fraud, racketeering and unlawful gaming relating to her role in organizing an illegal offshore gaming business, known as BetOnSports. When BetOnSports ceased operating in 2006, its customers lost more than $16 million.  On June 22, 2009, Lori Multz pled guilty to one count of racketeering and one count of conspiracy. Lori Multz was sentenced to 10 months of house arrest and ordered to turn over $6 million held in Swiss bank accounts.

Dermagist's filings with the Florida Secretary of State identified Lori Mutlz as vice-president of Dermagist from 2011 until 2017.

9.     Defendant John A. Catalfamo is an individual citizen of Florida domiciled at 742 Maritime Way, West Palm Beach, Florida 33410.  John Catalfamo is the registered owner of several websites that exclusively sell Dermagist and/or M2 products, including: eyevectin.com, dermalyze.com, and eyelighten.com.

10.     Bradley Markin, Sabrina Markin, Robert Markin, Lori Multz and John Catalfamo are collectively referred to as the "Individual Defendants."  Dermagist, M2, and SBM are collectively referred to herein as the "Corporate Defendants."   All defendants are collectively referred to as "Defendants."

## NON-PARTY

11.     Marketing Americas Inc. ("Marketing Americas") purports to be a Panamanian corporation with its principal place of business located at Torre ADR, Avenida Samuel Lewis y Calle Cincuenta y Ocho, Piso 8, Oficina 8C, Ciudad Panama, Panama.  Press releases issued by Marketing Americas list Sabrina Markin, a/k/a Melisa Garcia, as the contact person. Marketing Americas is directly or indirectly owned by Bradley Markin and Sabrina Markin.

## JURISDICTION AND VENUE

12.     Unimed seeks relief under various federal statutes, including the Lanham Act, 15 U.S.C. §§ 1114-18, and the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961, et seq.  Jurisdiction is vested in this Court by virtue of 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338(a).

13.     In the alternative, because there is complete diversity of citizenship between Unimed and Defendants, and because the amount in controversy exceeds $75,000, exclusive of interest and costs, this Court has original jurisdiction over this matter pursuant to 18 U.S.C. § 1332.

14.     Unimed's claims brought under Florida law are so related to its federal claims, over which the Court has original jurisdiction, that they form part of the same case or controversy.   Under Article III of the United States Constitution, the Court has jurisdiction over Unimed's state common law and statutory claims pursuant to 28 U.S.C. § 1367.

15.     Pursuant to Fla. Stat. § 48.193, this Court has personal jurisdiction over each Defendant because, among other reasons, each Defendant: operates, conducts, engages in, or carries on a business or business venture in the State of Florida or has an office in the State of Florida or has committed tortious acts with the State of Florida.

16.     In the alternative, pursuant to 18 U.S.C. § 1965(a), this Court has personal jurisdiction over each Defendant because each Defendant resides, is found, has an agent, or transacts his/her affairs in this district.

17.     To the extent any defendant is found not to be subject to this Court's personal jurisdiction pursuant to Fla. Stat. § 48.193 and/or 18 U.S.C. 1965(a), this Court may exercise personal jurisdiction over such defendant(s) pursuant to 18 U.S.C. § 1965(b) because the ends of justice require that the Court exercise personal jurisdiction over any defendant who claims not to have sufficient minimum contacts with the forum.   Defendants have engaged in a multi-district conspiracy to defraud and disparage Unimed.   The Court

has personal jurisdiction over most, if not all, of the alleged co-conspirators, and there is no other district that may exercise personal jurisdiction over all Defendants.

18.     Venue is proper in this district under 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this District and because a substantial part of the events or omissions giving rise to this claim occurred in this District.

**BACKGROUND**

**NATURE OF DEFENDANTS' BUSINESS**

19.     In or around 2011, the Individual Defendants entered the skin care products market.  To facilitate this business venture, the Individual Defendants formed the Corporate Defendants to market various skin care products including, but not limited to, Eyelighten and Eveyvectin.

20.     Defendants contract with one or more private label manufacturers who use standard formulas and techniques to manufacture Defendants' skin care products.  Like many private-labeled products in any market, different brands may sell the exact same product with simply a different label. The only thing unique about Defendants' skin care products is the label.

21.     Defendants primarily market their skin care products on sham consumer / expert review websites, such as skincreamsadvisor.com, buyerreview.com, and beautyhealthtimes.com, which purport to be impartial websites but whose content is entirely created and controlled by Defendants.

22.     Federal Trade Commission ("FTC") regulations state:

> When there exists a connection between the endorser and the seller of the advertised product that might materially affect the weight or credibility of the endorsement (i.e., the connection is not reasonably expected by the audience), such connection must be fully disclosed.

16 C.F.R. § 255.5.  Defendants' sham review websites completely ignore the requirements of the FTC regulations and never make any effort to disclose the connection between the endorser and Defendants.

23.    In fact, Defendants' sham review websites contain numerous false statements asserting the neutrality and objectivity of the reviews.  For example, beginning in May 2016 and continuing to the present, all of the following false statements (touting the website's purported lack of inherent bias) appear on buyerreview.com:

- "Compare 10 Top Wrinkle creams side by side to see which is best for removing wrinkles and the signs of aging."

- "These are the best 10 Probiotic supplements we could find."

- "Product reviews on Consumer Items you can Trust."

- "Marketing and Hype can make some markets very confusing to find the best products."

- "Buyerreview.com has reviewed 1000's of Products, and rated them into easy-to-understand Top 10 lists."

24.    Defendants utilize the sham websites to promote the use of their skin care products by publishing purportedly neutral and unbiased consumer / expert product reviews that denigrate competing products, such as those developed and sold by Unimed, while touting the virtues of Defendants' skin care products. To compound the damage, all of Defendants' sham reviews are linked to other websites that sell Defendants' skin-care products.

25.    The marketing or sales websites linked to Defendants' sham reviews include, but are not limited to:

- dermagist.com (registered on March 26, 2010 by Robert Markin and a now inactive legal entity);

- skinnybuzz.com (registered on November 7, 2014 by M2);

- eyevectin.com (registered on July 30, 2012 by John Catalfamo);

- dermalyze.com (registered on August 21, 2012 by John Catalfamo);

- ceraloft.com (registered on August 24, 2014 by Bradley Markin);

- eyelighten.com (registered on September 8, 2012 by John Catalfamo);

- garciniasurge.com (registered on August 24, 2014 by Bradley Markin);

- healthandskinslop.com (registered on February 15, 2015 by Bradley Markin);

- m2naturals.com (registered on September 5, 2014 by Robert Markin);

- mascugen.com (registered on October 8, 2014 by Robert Markin);

- menosure.com (registered on August 24, 2014 by Robert Markin);

- osteojuv.com (registered on October 10, 2013 by Robert Markin);

- prostalieve.com (registered on August 24, 2014 by Robert Markin); and

- skinpeutics.com (registered on September 1, 2014 by Bradley Markin and M2).

26.     Defendants' sham reviews are authored under various aliases, including Melisa Garcia, Peter Stockwell, Renee Starks, and Angela Whethers.

**SEO**

27.     Defendants drive consumers to their sham review and sales websites by a number of means, including search engine optimization ("SEO") techniques and paid-placement advertising (such as Google Adwords, which is described below).

28.     SEO is the practice of increasing the quantity and quality of traffic to a website through organic search engine results, as opposed to increasing traffic through paid-placement programs, such as Adwords.

29.     When a computer user enters a search on Google (or any other search engine, such as Yahoo or Bing), the search engine sends out a "crawler" that gathers all information it can find on the Internet relating to the search.  The crawler brings that information back to the search engine to build an index, that index is then fed through an algorithm that tries to match all of the data gathered by the crawler to improve the quality of the data appearing on the Search Engine Results Page ("SERP"), e.g., if a person is trying to buy apples for an apple pie, information about Apple computers would not be considered a quality result.

30.     Programmers who specialize in SEO write content for websites that is designed to help the search engine crawlers understand what they are seeing.

31.     Common tools for SEO are title tags and metadata descriptions that provide information to the crawlers.

32.     The goal of SEO is to improve a website's ranking on the SERP. Defendants are highly proficient in the use of SEO techniques and use SEO techniques (among other tools) to direct consumers searching for Unimed products to Defendants' sham websites.

**Paid-placement Advertisements**

33.     Google Adwords is a paid-placement advertising product offered by Google to companies or individuals engaged in Internet sales.  Adwords enables sellers to pay for their website to appear higher on the SERP.

34.    Other search engines such as Bing and Yahoo have similar advertising products.  Hereinafter all paid-placement advertisement appearing on any SERP is referred to as Adwords.

35.    If a seller does not pay for placement on the SERP, and relies merely on SEO, the seller must wait for its website to organically work its way up the first page of the SERP rankings.  By using Adwords, a seller can immediately elevate its website to the top of the SERP.

36.    Adwords enables a seller to pick keywords that a consumer may use on Google when searching for the product(s) sold by the seller.   When the seller's keywords are used in a Google search, the seller's advertisement will appear on the SERP.

37.    For example, Unimed uses Adwords to direct consumers who enter the keyword "Chamonix" to its official sales website:   betterskintoday.com.    When "Chamonix" is used in the Google search, betterskintoday.com appears at the top of the SERP, with "Ad" appearing before the URL:



38.    In highly competitive markets, such as the skincare market, multiple competitors may bid on the same keywords, which results in several "Ad" websites appearing at the top of the SERP.  If a seller outbids its competitors for a particular

keyword, the seller's website will appear above the websites of its competitors.  Even if a seller pays the highest bid for a keyword, however, the websites of its competitors will still appear immediately above or below the seller's website on the SERP.

39.     Sellers pay Google each time a consumer clicks on the seller's "Ad" website appearing on the SERP.  The seller and its competitors bid on a cost-per-click basis.

**DEFENDANTS' SHAM REVIEW WEBSITES**

40.     Using paid-placement advertisements (such as Adwords) and SEO, Defendants drive consumers to their sham product review websites, where Defendants repeatedly and continuously post false, deceptive, and misleading information about Unimed's products and their own products.  For example:

**Buyerreview.com**

41.     As of January 24, 2014, buyerreview.com was registered to Robert Markin on behalf of M2.  Buyerreview.com continues to publish information to the public as of the date of this complaint.

42.     On August 23, 2016, buyerreview.com posted a review denigrating Unimed's Genucel® product.  The review was purportedly authored by "Peter Stockwell," who is a proxy of one or all of the Individual Defendants.  The review falsely states that there is "ZERO mention of targeting wrinkles" in Genucel® marketing materials, even though Unimed's website repeatedly discusses how Genucel® addresses wrinkles and one of the products contained in the reviewed Genucel® kit is clearly labeled "Anti-Wrinkle Treatment."  The review further deceptively asks: "Why Spend $139.99 only to have to use

additional products to treat your wrinkles?"  The rhetorical question misleads consumers and falsely states that consumers must purchase additional products to treat their wrinkles.

43.     Defendants' August 23, 2016 sham review of Unimed's Genucel® is surrounded by images and links to Defendants' "Best rated" list of competing products – FOUR of the top-rated products listed on Defendants' sham comparison chart are Defendants' own products.  Defendants' sham chart overlooks the hundreds of negative reviews relating to Defendants' products that can be found by typing "dermagist complaints" into any Internet search engine.

44.     Defendants further falsely state that their product reviews are based on research, such as surveys of on-line product reviews, further "guaranteeing" that the reviews are not biased.  In truth, Defendants' rating are not based on any objective and unbiased research.

45.     Buyerreview.com does not disclose that it is owned and controlled by Defendants, is not an unbiased and objective product review website, and is no more than an advertisement for Defendants' products.

**Skincreamsadvisor.com**

46.     Skincreamsadvisor.com was registered by Dermagist on April 19, 2016 and continues to publish information to the public as of the date of this complaint.  It is used by Defendants to post sham reviews regarding the products of Unimed and other competitors.

47.     As with buyerreview.com, skincreamsadvisor.com does not disclose that it is owned and controlled by Defendants, is not an unbiased and objective product review website, and is no more than an advertisement for Defendants' products.

48.     For example, in a review published on May 8, 2016, skincreamsadvisor.com falsely states that it "reviewed 5 Top Creams for the eye area, and compared them on many points … [enabling us] to form a solid opinion on which are best…."   In truth, the accompanying chart indicates that 4 of the 5 top creams for the eye area are marketed and distributed by Defendants (i.e., Dermagist Eye Gel, Skinpeutics Eye Serum, Eyevectin Eye Cream, and Eyelighten Eye Serum).  Not surprisingly, the 5th eye cream (i.e., Genucel Eye Therapy) is a Unimed eye cream and was rated 5 out of 5 by skincreamsadvisor.com.



Solid advice on skin creams

### Editors Choice Top Eye Creams

**The Best Eye Creams in our Opinion**

How much do we HATE dark circles beneath the eyes?  Think about those dreaded puffy bags that sit under our eyes like pillows…  Pillows that do make us look 20 years older than we are.  Last but most certainly not least, the lines and wrinkles around our eyes could possibly be the most stubborn to eliminate.   For all these reasons, choosing the most useful eye cream or eye gel can be a life-saving endeavor.  But, there are lots of, numerous eye ointments available on the market that simply never work.  Even worse, they cost a lot of money, and certainly will leave you also MORE exhausted and old-looking than you were before you tried them.

We compiled this list to make your life a little easier.  We know that the marketing hype can be frustrating, that surrounds many creams.  For that reason, we reviewed 5 Top Creams for the eye area, and compared them on many points.  After finding results online from common review sites, and consumer report sites, we were able to form a solid opinion on which are the best, and which have the most loyal customer following. **Also, Below the Chart** are more tips and insight to finding the right eye cream for you.



| Top Pick | Solid Value | | | |
|---|---|---|---|---|
| **Product:** Dermagist Eye Gel | **Product:** Skinpeutics Eye Serum | **Product:** Eyevectin Eye Cream | **Product:** Eyelighten Eye Serum | **Product:** Genucel Eye Therapy |

49.     Similarly, in or around May 2016, skincreamsadvisor.com published its top 5 neck creams.  Defendants falsely claimed that the list was the product of "almost a year of gathering information on the top neck creams in the world."  Defendants' further claimed that their top 5 list was a "comprehensive comparison across the board."   Predictably,

Defendants' products were ranked number 1 and number 2 on skincreamsadvisor.com's top 5 list for neck creams.

50.    With regard to its top 5 list of wrinkle creams, skincreamsadvisor.com falsely states that the list was based on "feedback from customers, reports on consumer-protection websites, and also … our own homework on the product."   Once again, Defendants' products were ranked number 1 and number 2, with the related reviews denigrating Unimed's competing Genucel® product and competing products by Christie Brinkley and Cindy Crawford.

51.    Defendants further use Adwords to misdirect consumers searching for "Genucel" to a sham review posted on skincreamsadvisor.com.  The headline "Don't Buy that Eye Cream" appeared on Defendants' paid advertisement appearing near the top of the resulting SERP:



52.     After clicking on the advertisement, consumers were taken to a skincreamsadvisor.com webpage where a supposedly impartial review denigrating Unimed's Genucel® was posted.  In truth, the sham review was nothing more than a deceptive advertisement for Defendants' competing M2 brands.

53.     After clicking on the advertisement, consumers also saw a chart that purports to review five skin care products, including Unimed's Genucel®.  With the exception of Genucel®, the four remaining products on the chart are sold by M2 and are rated higher than Genucel®.

54.     Skincreamsadvisor.com also provides a link to M2's order page for its products so that consumers can easily purchase Defendants' products after reading the biased recommendations.

55.     Defendants' sham reviews never disclose that skincreamsadvisor.com is simply an advertisement for M2 products.  Defendants' disclosures are obfuscated and buried on website pages unlinked to their sham reviews.  For example, if consumers find the disclosure page for skincreamadvisor.com and if consumers affirmatively click on that page, the website states that it "may or may not receive compensation for the products that are recommended or listed as best," that it has "not necessarily tried or tested any of the products listed on the website," that the "reviews and rates in many cases are … our own advertorial language designed to sell certain products," that "the owners of skincreamadvisors.com benefit from the sale of certain products on our website," and that the "reviews and ratings of products on our website are for ENTERTAINMENT purposes only … [and] should not be relied upon when making any buying decision."

56.     Skincreamsadvisor.com also falsely represents the cost of Unimed's Genucel® product.  For example, Defendants state that Genucel® costs "$110.00 / tube." In truth, for $129.95, consumers receive *two* tubes of Genucel® Plant Stem Cell Eye Therapy, and an order of Genucel® immediate effects, a jar of Esotique-RF with Matrixyl, and an order of L'essence Advanced Neck Treatment.

57.     After receiving a cease and desist letter from Unimed in March 2017, Defendants removed the deceptive paid-placement advertisement from the SERP and the false review chart.   Nonetheless, Defendants employed the false paid-placement advertisement and sham review chart to misdirect Genucel® consumers for several months prior to March 2017.

58.     Defendants' scheme to defraud Unimed, however, was not impeded by Unimed's cease and desist letter.  Defendants simply removed the offending sham review from skincreamsadvisor.com and republished it on another of Defendants' sham review websites, beautyhealthtimes.com.

**Beautyhealthtimes.com**

59.     Beautyhealthtimes.com was registered by Dermagist on March 28, 2017 and continues to publish information to the public as of the date of this complaint.

60.     Defendants' promote their sham reviews of Unimed's Genucel® on beautyhealthtimes.com by purchasing Adwords that cause paid advertisements to appear near the top of the SERP when consumers search for Unimed's skin care products. Defendants' paid advertisements bear the headline: "5 Top Eye Cream Analyzed" and "Find Out Which Really Work." When consumers click on the advertisements, they are taken to Defendants' sham review on beautyhealthtimes.com.

61.     Once again, without disclosing that beautyhealthtimes.com is owned and controlled by Defendants, the sham review states, among other things: "Bottom Line: We feel there are superior anti-wrinkle creams on the market.  Go take a look at the TOP RATED anti-aging cream in this category."  Of course, the "TOP RATED" cream that is linked to the review was an M2 product.

62.     Beautyhealthtimes.com publishes an "Advertorial Disclaimer," which states (in part) that products have "not necessarily been tried or tested" and that the "reviews or rating in many cases are a compilation of findings online and our own advertorial language designed to help sell certain products."  On another page, Defendants' claim their sham reviews are the result of "weighing the opinions we found online left by real consumers."  Defendants fail to disclose that many of the reviews relied upon are sham reviews that Defendants published on their other sham review websites.  Defendants also fail to disclose that the "certain products" promoted on the website are all products sold by Defendants.

63.     Most egregiously, Defendants' disclaimer on beautyhealthtimes.com purports to warn consumers that "[t]he reviews or ratings of products on our website are for ENTERTAINMENT purposes only…. The reviews on our website should not be relied upon when making any buying decision."  Consumers receive this disclaimer only if they affirmatively click on the disclaimer page.  The disclaimer does not appear in conjunction with any of the sham reviews appearing on beautyhealthtimes.com and does not appear when consumers click on links that will take them from the sham review to an order page for Defendants' products.

**Consumerskin.com**

64. Consumerskin.com was registered by Dermagist on April 19, 2016 and has since falsely purported to publish "real consumer reviews on top brands," when the reviews are actually Defendants' sham reviews that falsely denigrate competing products while deceptively promoting Defendants' products.

65. Defendants again purchased Adwords that directed Genucel® consumers to Defendants' sham reviews. Defendants' advertisements appeared at or near the top of the SERP and bore headlines, such as "Avoid Eye Cream Rip-offs."

66. In describing their review process on consumerskin.com, Defendants falsely state that "[t]ransparency is our goal" while not disclosing that consumerskin.com is a deceptive advertisement for M2 and Dermagist products.

67. Defendants further deceptively state that "[w]hile no one review can dictate an impression on a product, trends and similar experiences can provide insight that can prove helpful to many consumers." Defendants fail to disclose that many of the reviews that they consider are sham reviews posted by Defendants' on their other websites.

68. Defendants also falsely refer to their reviewers as "skincare experts" when, in fact, the reviewers are employees or principals of the Corporate Defendants.

**Skinproductshopper.com**

69. Skinproductshopper.com was registered by Dermagist on February 10, 2017 and continues to publish information to the public as of the date of this complaint.

70. Skinproductshopper.com is another sham review website owned and controlled by Defendants.

71.    Like Defendants' other sham review websites, skinsproductsshopper.com does not contain required FTC disclosures regarding its affiliation with Defendants. Defendants employ misleading reviews and top 5 charts that attempt to create the appearance of unbiased, objective product information but are, in fact, nothing more than advertisements for Defendants' products.

72.    Defendants' also make several false representations regarding Unimed's Esotique XV product.  When describing Esotique XV's "cons," Defendants falsely state that Unimed's Esotique XV is "available online only" and purchases result in "automatic shipments."



In fact, Unimed sells Esotique XV by telephone, as well as online and by mail-order catalogue, and Unimed offers one-time order options to consumers; automatic shipments are not required.

73.     Defendants further state that there are many online negative reviews of Unimed's Esotique XV and other Unimed products, but Defendants do not cite or link to any negative review and offer no evidence to support their false assertions.  To the extent there are negative reviews of Unimed products, a substantial number have been artificially manufactured by Defendants.

74.     Moreover, on March 5, 2017, Sabrina Markin (under the username "Sabrina") posted what purports to be a consumer comment on a skinproductshopper.com review of Unimed's Genucel®.  The comment is entitled "Good but not for the money":



Sabrina Markin does not disclose that she is an agent, officer, and/or employee of the Corporate Defendants, who are competitors of Unimed.

**Skinimperfection.com**

75.     Skinimperfection.com was registered by M2 on April 19, 2016 and continues to publish information to the public as of the date of this complaint.

76.     Skinimperfection.com is another sham review website owned and controlled by Defendants.

77.     Skinimperfection.com also does not contain required FTC disclosures regarding its affiliation with Defendants and employs sham reviews and biased top 5 charts.

78.     Skinimperfection.com further falsely states that its reviews are authored by "[s]pecialists in the science of products in the vertical markets of beauty, skin care and other health products," when in fact the reviews are authored by persons whose primary objective is to sell Defendants' products and are supported by little if any scientific research.

79.     Skinimperfection.com falsely claims that its reviewers are "like the supreme consumer group who has sampled loads of products and has done lots of analysis on issues revolving around heath and attractiveness and lifestyle."   In truth, skinimperfection.com's reviewers are not anything like a "consumer group," do little or no product sampling, and engage in no objective analysis.   Skinimperfection.com reviewers are Defendants' agents, who are merely disguised as consumers and who deceptively market Defendants' products.

80.     Defendants' deceptive marking techniques are not limited to sham review websites, but also extend to blogs, YouTube videos, and social media posts that appear to be published by neutral evaluators but are in fact posted by the Individual Defendants under various aliases or are posted by reviewers paid by Defendants.

**YouTube Videos**

81.     Defendants create and upload YouTube videos to maximize exposure to their sham review websites and to enhance the damaging effect that their videos have on competing products.

82.     In particular, buyerreview.com hosts a YouTube channel that contains over 100 videos and has amassed about 500,000 views.  Again, Defendants' YouTube channel is devoid of any required FTC disclosures.

83.     The YouTube videos purport to objectively review *ALL* competing skincare products, including those marketed by Defendants and its competitors (including Unimed). All of Defendants' YouTube videos, however, contain embedded links redirecting consumers to Defendants' sham review website, buyerreview.com.

84.     Defendants' YouTube videos are hosted by Sabrina Markin, who poses as an unbiased expert.  In her videos, Sabrina Markin denigrates all competing skincare products (including Unimed's products) while boasting about the superior performance of Defendants' products.  For example, in her review entitled "dermagist neck cream review" (https://www.youtube.com/watch?v=-fqTmwM_7PY), posted on April 28, 2014, Sabrina Markin makes the following false and/or misleading statements:

a.   "Hi there, I'm Sabrina with buyerrreview.com, and I'm here to provide you with no-nonsense, real beauty product reviews."   In truth, Sabrina Markin is associated with Dermagist (who markets the neck cream under review in the video).   In truth, neither buyerreview.com nor Sabrina Markin are "here" to provide "no-nonsense, real beauty product reviews"; instead, they are "here" to advertise and promote Dermagist products.

b.   "We decided to order [Dermagist neck cream] and see for ourselves what the big buzz is all about.  The product was ordered on line and came within 3-5 business days – just like they promised when we placed the order."  In truth, Sabrina Markin never ordered the product on-line or otherwise; as a part-owner of Dermagist, there would have been no need for her to order the product.  In truth, the only "buzz" about the product is the artificial reviews appearing on Defendants' sham websites.  In truth, no one promised Sabrina Markin that the

product would be delivered in 3-5 days because Sabrina Markin never ordered the product from Dermagist.

    c.   "See you soon with more real and helpful beauty product reviews." In truth, Sabrina Markin's review is no more "real or helpful" than any other paid advertisement.

As of the filing of this complaint, Sabrina Markin's misleading review remains posted on YouTube and is accessible to consumers.

    85.    On July 5, 2014, Sabrina Markin posted a sham review of Defendants' Eyelighten product on buyerreview.com's YouTube channel (https://www. youtube.com/watch?v=icXWPbRyYdg). Once again, Sabrina Markin falsely stated "I'm here to provide you with real product reviews," when in fact the purpose of her review was to advertise Defendants' Eyelighten product. As of the filing of this complaint, Sabrina Markin's misleading review remains posted on YouTube and is accessible to consumers.

    86.    In comparison to the positive reviews of Defendants' products, Sabrina Markin's review of competing products is unfairly critical and negative. For example, on May 29, 2014, Sabrina Markin posted a sham review of Meaningful Beauty® products, a brand that is endorsed by Cindy Crawford, on buyerreview.com's YouTube channel (https://www.youtube.com/watch?v=pbKwiQhDP3o). During her sham review, Sabrina Markin states, among other things, "its texture is oily and thick… you are definitely left with an oily film on your skin," "it is oil-based, therefore feeling greasy," and "as you spread it, it feels oily, but at the same time its gel-like and runny… you can definitely still feel it on your skin." As of the filing of this complaint, Sabrina Markin's misleading review remains posted on YouTube and is accessible to consumers.

87.     Not only does Sabrina Markin post sham reviews promoting Defendants' products on YouTube, but Defendants also employ paid third-party reviewers to promote their products.  For example, on September 16, 2016, Viva Aldridge posted a YouTube video entitled "Genucel reviews and consumer product report" (https://www.youtube.com/watch?v=EsZA0NDx9ts). Once again, Genucel® is a Unimed product.  The video directed visitors to Defendants' sham review website:  buyerreview.com/genucel-reviews/.

88.     Prior to receiving a cease and desist letter from Unimed, consumers clicking on the link to buyerreview.com/genucel-reviews/ were taken to a page that unfavorably compared Unimed's Genucel® to Defendants' products under the guise of an objective and neutral review of products available to consumers.

**Marketing Americas, Inc.**

89.     To maximize traffic to their sham review websites, Defendants also publish deceptive press releases that promote the purported objectivity and unbiased nature of the product reviews appearing on the sham review websites.  The press releases contain no disclosures mandated by the FTC.

90.     Defendants' misleading press releases are commonly issued by Sabrina Markin, using the alias Melissa Garcia, under the guise of Marking Americas Inc., a company purportedly based in Panama.

91.     For example, on September 13, 2016, Sabrina Markin issued a press release entitled "Marketing Americas Releases Genucel Reviews."  The press release falsely states that Genucel is a Panama-based product, when in fact Unimed is located in New Jersey and distributes its products from New Jersey.  Defendants' false representation negatively impacts Genucel's appeal to consumers who will only buy American-made products.

92.     Sabrina Markin's press release further falsely states that Unimed's Genucel® is "a new product, there are limited buyer reviews available."  In truth, Genucel® has been on the market since 2013 and has been reviewed extensively.

93.     Marketing America's false press releases are embedded with hyper-links that lure consumers searching for Unimed's Genucel® to Defendants' sham review websites that promote Defendants' products.

94.     Defendants' false press releases are also picked up by legitimate organizations, such as PRLog.com, who publish beauty-related news, exponentially increasing the exposure of and harm caused by Defendants' false statements.

**UNIMED'S DAMAGES**

95.     Defendants' activities have caused substantial damage to Unimed, including (but not limited to) lost sales, increased costs relating to paid-placement advertising, and consulting fees incurred to mitigate the damage caused by Defendants' activities.

**Lost Sales to Genucel.com Visitors**

96.     Before Defendants began targeting Unimed's products with sham reviews, genucel.com's conversation rate was always well-above 3.00%.

97.     For example, in April 2016, the month before Defendants' sham review website, skincreamsadvisor.com, was launched, over 25,000 unique visitors visited Unimed's genucel.com website.  Of those visitors, 3.35% purchased Unimed products (this percentage is known as the conversation rate).

98.     As noted earlier, in order for a seller to appear higher on the SERP than its competitors, the seller must out-bid its competitors for Adwords that customers will use to search for the seller's product on Google and other internet search engines.

99.     In May 2016, when Defendants' skincreamsadvisor.com was launched, Defendants starting bidding against Unimed for the Adword "genucel" and other keywords that direct consumers to Defendants' sham, negative reviews of Genucel®. Thus, whenever a consumer searches for "Genucel", the resulting SERP lists not only Unimed's genucel.com but also Defendants' sham review websites, such as skincreamsadvisor.com, and the denigrating titles of the sham reviews.  Even if Unimed out-bid Defendants for a higher listing on the SERP, the titles to Defendants' negative reviews still appeared on the SERP immediately below genucel.com.  Thus, after May 2016, every consumer who searched for Unimed's Genucel® on the Internet was exposed to Defendants' false and deceptive reviews of Genucel®.

100.    As a result of Defendants' sham reviews, genucel.com's conversion rate steadily declined, going from 3.10% in May 2016 to only 1.83% in January 2017, thereby lowering Unimed's customer acquisition by over 30%.

101.    Unimed thereafter served Defendants with a cease and desist letter. Defendants removed sham reviews relating to Genucel from skincreamsadvisor.com.

102.    Although genucel.com's conversion rate increased to 2.21% in March 2017 and 2.82% in May 2017, genucel.com's conversion rate never returned to 3.00% or better.  Defendants' misrepresentations, sham reviews, and deceive marketing are the direct cause of the permanent damage to genucel.com's conversion rate.

103.    In March 2017, Defendants again began publishing their sham Genucel® reviews on beautyhealthtimes.com.   Once again, genucel.com's conversation rate dropped below 2.00% due to Defendants' deceptive and fraudulent marketing tactics.

**Lost Visitors to Genucel.com**

104.    In addition to genucel.com's reduced conversion rate (i.e., fewer customers who visited genucel.com bought products), genucel.com lost an average of 18,869 unique visitors per month (i.e., persons who saw Defendants' sham reviews on the SERP and never visited genucel.com) by reason of Defendants' false and deceptive sham reviews.

105.    As a consequence of genucel.com's lower conversion rate and lost visitors, Unimed lost over $3.8 million in revenue for the twelve-month period of May 2016 – April 2017.

**Increased Paid-Placement Advertising Costs**

106.    Defendants' competitive bidding for "genucel" and other genucel-related Adwords greatly increased Unimed's cost for paid-placement advertising.

107.    Before the launch of skincreamsadvisor.com in May 2016, Unimed spent an average of approximately $18,000 per month on paid-placement advertising.

108.    In the twelve-months following the launch of skincreamsadvisor.com, Unimed spent an average of approximately $52,469 per month on paid-placement advertising.

109.    As noted above, despite Unimed's additional spending on paid-placement advertising, genucel.com had fewer unique visitors and a much lower conversion rate, on average.

**Consulting Fees Paid to Mitigate Losses Caused by Defendants**

110.     In order to combat Defendants' deceptive and fraudulent marketing techniques, Unimed hired all of the following consultants and contractors (among others):

- Velox – improvement of page position for Unimed products and websites on the SERP.

- Cofa Media Group – redesign of website to improve SEO and SERP positioning.

- Al Media – management of paid-placement advertising to fight against Defendants' sham reviews.

- Conversion Fanatics – improvement of conversion rate.

111.     Unimed spent approximately $238,000 on consultants and contractors in its effort to mitigate the damages it sustained as a result of Defendants' deceptive and fraudulent marketing techniques.

## PRIOR LITIGATION AGAINST DEFENDANTS

112.     Unimed is not the only competitor in the skin care industry who has brought suit against the Individual Defendants.

**South Beach Skin Care, Inc. v. Robert Markin, et al.,**
**Case No. 1:09-cv- 20249 (S.D. Fla.)**

113.     On January 29, 2009, South Beach Skin Care, Inc. ("SBSC") filed a complaint against Robert Markin and several unknown legal entities in the federal district court for the Southern District of Florida.

114.     SBSC alleged that Robert Markin, through unknown legal entities and the websites wrinklebest.com and bestwrinklecreamsreview.com, posted various messages,

which claimed to be from former SBSC customers, defaming and otherwise disparaging SBSC.

115. SBSC alleged that Robert Markin, through his legal entities, claimed to be "a neutral website dedicated to posting all customer reviews sent to it…. Instead, [Defendants] … only post negative comments submitted by users of Defendants' websites and delete all positive comments submitted by users and posted on the sites."

116. SBSC also alleged that Robert Markin, through his legal entities and websites, has "posted various negative and defaming comments concerning [SBSC] and its product…. with intent to cause harm to Plaintiff and divert potential sales from Plaintiff to Defendant Markin's website."

117. According to the court docket, the SBSC litigation was dismissed pursuant to a settlement agreement.

**Newtechbio, Inc. v. Septicleanse, Inc., Case No. 3:12-cv-05882 (D.N.J.)**

118. Defendants' deceptive business practices are not limited to the skin care industry. Defendants have employed their "affiliated" marketing techniques in many industries, but regardless of the industry, the fundamentals of Defendants' business strategy remain the same, i.e., post sham reviews that denigrate competing products on websites like buyerreview.com or betterreview.com; using SEO and Adwords, direct consumers searching for competitive products to the sham review websites; link the sham reviews, which boast that Defendants' products are "top 5" or "the best," to websites selling Defendants' private-label products; when consumers order the Defendants' products, fill the orders with a generic private-label product at a highly inflated price when compared to products of similar quality in the same market.

119.    On September 19, 2012, Newtechbio, Inc. ("Newbtechbio") filed a complaint against the Individual Defendants (i.e., Bradley A. Markin, Sabrina Markin, Lori Multz, and Robert A. Markin) and their company, Septicleanse, Inc. (which sells septic tank chemicals online at septicleanse.com), in New Jersey federal court.

120.    Newtechbio alleged:

- "The individual defendants … [via Septicleanse] use interactive product marketing websites with fictitious derogatory reviews of competing septic system chemical products … [to] disparage competing products, namely those of [Newtechbio] and its legitimate competitors, causing them to suffer substantial losses of sales and profits."

- "[Defendants] … use[] search engine techniques which elevate the fictitious product review websites to top search engine results positions [SERP].   Those 'product review' websites are designed to mislead consumers searching the Internet for reliable information about septic system chemicals.   The fictitious reviews are intended to, and do decrease the sales of [Newtechbio] and their legitimate competitors and thus increase defendants' sales."

- "[Defendants purchase] … advertisements using the trademarks and trade names of [Newtechbio] and its legitimate competitors as key words on various search engines including Google, Yahoo, and Bing; and implant[] those trademarks and trade names as metadata in defendants' websites.   As a result, when a consumer conducts Internet

research for [Newtechbio's] trademarks such as NEWTECHBIO or NT-MAX on a search engine, defendants' advertisements and websites are displayed ahead of plaintiff's advertisements and website."

- "Prior to June 14, 2012 there were no negative reviews of any of [Newtechbio's] products on the Internet.

- "[After June 14, 2012, Defendants'] … websites contained and/or still contain intentionally false, disparaging and deceptive information and rankings concerning the septic chemicals of [Newtechbio] and its legitimate competitors, examples of which are:

  o "What happened when we tested [NT-MAX]?  We were excited to see how it worked.  Our tester was not so pleased."

  o "… [A]fter a month of using the NT MAX, [the tester's] system was not at an acceptable level of function.  He ended up having the system pumped out, at a cost of a few hundred dollars."

  o "★ ★ ★ ☆ ☆ I believe our home benefitted from using this septic treatment. However, it was nowhere near what we expected, in terms of speed of showing results, and also in value. We ended up having to pump our system out, in order for it to get back to normal. However, this product has worked very well to keep our system maintained. For that purpose, it is very good."

- ⭐⭐☆☆☆ "Not a product I would buy again. We have been using it for 3 weeks, and our yard is still a muddy, backed up mess, and it smells like a sewer."

- ⭐⭐☆☆☆ "I think maybe our very cold temperatures have prevented this product from working.  We got no results from pouring it directly into our septic tank…. I don't know, but nothing has resulted from using this."

- "In our testing of NT Max we saw those steps happening, not as fast as our Best Septic Treatment, but they did happen.  In our opinion, it was a bit pricey for the results we got, but then again we did purchase their most powerful treatment, so perhaps the price was average as far as the market goes."

- "See How NT Max Compared to our Top 8 Septic Treatment Comparison Chart."

- "We consider NT Max a quality treatment and a professionally run operation.  While it didn't rate as well as our best septic treatment…."

- "All of the aforementioned reviews are fictitious and were created by defendants."

- "Even those fictitious reviews that don't specifically mention plaintiff Newtechbio or its NT-MAX product are very damaging.  For example, providing a purported review list of "top ten" or "top eight" products

not including NT-MAX or Newtechbio results in loss of sales…. Even worse is the statement that if a product is not on the defendants' list (which did not include plaintiff's product), one should reconsider a decision to buy it, since it was tried and does not work."

- "Upon seeing the misleading statements in sponsored advertisements and fictitious reviews, customers and prospective customers are lured away from [Newtechbio's] website and to defendants' marketing websites."

121.   Newtechbio alleged that all of the following websites were sham review websites owned and controlled by Defendants to deceptively promote Defendants' products while denigrating competing products:   bestseptictreatments.com, homesepticproducts.com, sewertreatment.net, and cloggedsepticsystem.com.

122.   Newtechbio brought claims for violations of RICO, trade libel and unfair competition, intentional interference with prospective economic advantage, trademark infringement, and violations of 15 U.S.C. § 1125(a) (false advertising).

123.   The Newtechbio litigation was resolved by the parties' consent to permanent injunction and settlement.

124.   Pursuant to the permanent injunction, the Individual Defendants, and their related legal entities, were (among other things):

- Required to post a disclaimer on each web page containing a sham review, rating, or ranking, which stated: "***The reviews, ratings and rankings on this website were written by persons affiliated with Septicleanse, and the

ones marked *f* are fictitious.  The opinions expressed are solely those of Septicleanse affiliated persons."

- Prohibited from offering any of Newtechbio's septic systems products for sale; generating, sending, displaying or posting any information concerning Newtechbio's septic system products that is inaccurate, deceptive, disparaging or misleading; stating or implying that only septic system products that are listed provide acceptable performance; and testing, or stating or implying that one or more of Newtechbio's current or future septic system products has been tested."

- Prohibited from displaying advertisements, posts, blogs or articles which appear, or for which links appear when a person types into a search engine, or a website, words or phrases containing Newtechbio's current or future products or marks, including but not limited to nt-max, ntmax, nt max, newtechbio, septiblast, sept-blast, septi blast or variations of the same.

- Prohibited from incorporating into any website meta-data or any other code accessed by search engines, any word or phrase containing Newtechbio's current or future septic product trademarks or septic products offered for sale by Newtechbio.

**Advantage Nutraceuticals, LLC v. Melissa Garcia, et al.**
**Case No. 2:15-cv-00066 (D. Utah)**

125.    On February 2, 2015, Advantage Nutraceuticals, LLC ("Advantage") filed a complaint against Sabrina Markin, a/k/a Melissa Garcia, and buyerreview.com in the federal district court for the District of Utah.

126. Advantage allegedly sold and distributed high-quality weight loss supplements.

127. Advantage alleged that Sabrina Markin, through buyerreview.com, made many false and misleading statements about Advantage's products and people associated with Advantage and its products.

128. Advantage further alleged that Sabrina Markin used Advantage's trade name and trademarks in meta-tags, keywords, and other online marketing efforts "to direct those looking for Advantage's products to [buyerreview.com] for the purpose of marketing Defendants' competing weight loss pills."

129. Advantage's complaint referred to and included several exhibits, demonstrating that:

- A paid-placement advertising would appear at or near the top of a consumers search for Advantage products, directing consumers to a buyerreview.com webpage entitled "Weight loss Aid Scams."

- Defendants' products were the highest ranked products on their "top 10 list of best weight loss supplements," without any disclosure that Defendants' controlled the website and were affiliated with the products ranked highest on the list.

130. Advantage brought claims for trademark dilution, trademark infringement, unfair competition (federal and state), intentional interference with economic relations, violation of Utah's truth in advertising statute, and defamation.

**Wire Fraud (18 U.S.C. § 1343)**
**Florida Communications Fraud Act (Fla. Stat. 817.034)**

131.    The Individual Defendants, by and through each other and the Corporate Defendants, engaged in a systematic and ongoing scheme with the intent to defraud, deceive, mislead, and/or fraudulently induce skin care consumers to buy Defendants' products rather than the products of Unimed and other competitors in the skin care market.  Defendants knowingly devised or knowingly participated in a scheme or artifice to defraud Unimed or to obtain the money or property of Unimed (or its customers) by means of false or fraudulent pretenses, representations, or promises in violation of 18 U.S.C. § 1343 and Fla. 817.034(3)(d) and 4(a-b).

132.    Defendants' sham reviews and other business practices described above are contrary to public policy or fail to measure up to the reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society in violation of 18 U.S.C. § 1343.

133.    Defendants could foresee that the interstate wires would be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in or carrying out the scheme, within the meaning of 18 U.S.C. § 1343.

134.    In particular, Defendants knew or could foresee that the interstate wires would be used to transmit sham reviews on Defendants' websites (such as buyerreview.com, skincreamadvisor.com,   beautyhealthtimes.com,   consumerskin.com,   skinproduct-shopper.com and skinimperfection.com) and on YouTube and to transmit false and deceptive press releases through Marketing Americas.

135.    Defendants acting singly and in concert, personally or through the Corporate Defendants (or their agents), used the interstate wires or caused the interstate wires to be

used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in, or carrying out a scheme to defraud Unimed and other competitors in the skin care market, within the meaning of 18 U.S.C. § 1343.

136.   It is not possible for Unimed to plead with particularity all instances wire fraud that advanced, furthered, executed, and concealed the scheme because the particulars of many such communications (such as when sham reviews or deceptive product ranking reports were first published on websites and when (or if) such sham reviews or deceptive product ranking reports were removed from the internet) are within the exclusive control and within the exclusive knowledge of Defendants other presently unknown individuals.

137.   By way of example, however, the Individual Defendants specifically used the interstate wires or caused the interstate wires to deliver each and every false, deceptive and misleading statement described in paragraphs 19 through 94 (*supra*), including but not limited to the following false, deceptive and misleading communications:

| Type of Communication | Date of Initial publication | Website | Description |
|---|---|---|---|
| | | | |
| Consumer Comment | 02/05/10 | amazon.com | Lori Multz posts a consumer comment stating that she has been using Dermajuv products for 5 months and that she looks and feels "years younger" and "for the price there is nothing better"; Multz never discloses her affiliation with Dermagist. |
| YouTube Video | 04/28/14 | youtube.com/watch?v=-fqTmwM_7PY | Sabrina Markin posts a deceptive review of dermagist neck cream, falsely claiming that she provides "real beauty product reviews" without disclosing her affiliation with Dermagist and deceptively claiming to have ordered the |

| | | | product and the product was received in 3-5 days. |
|---|---|---|---|
| YouTube Video | 05/29/14 | youtube.com/watch?v=pbKwiQhDP3o | Sabrina Markin posts a sham review of Meaningful Beauty® products; the review subjectively disparages the products, describing them as "oily and thick," "greasy," and "gel-like and runny." Sabrina Markin never discloses her association with Defendants' competing products. |
| YouTube Video | 07/05/14 | youtube.com/watch?v=icXWPbRyYdg | Sabrina Markin falsely states that she provides "real product reviews." |
| Online Review | 06/10/16 | skincreamadvisor.com | "Cameron Vaas" posts a sham review of Unimed's Genucel® entitled "Genucel Eye Cream by Chamonix Reviews Fail to Impress"; stating (among other things) "frankly, we think the formula is slightly incomplete" and "[f]or the price, we feel that there are better formulated eye creams on the market," linking to a page selling Defendants' eye creams. |
| Online Review | 08/23/16 | buyerreview.com | "Peter Stockwell" posts a sham review of Unimed's Genucel®, misrepresenting that it does not target wrinkles and misrepresenting its price. |
| Online Press Release | 09/13/16 | marketersmedia.com/marketing-americas-releases-genucel-reviews/132494 | Sabrina Markin issues a press release through Marking Americas, falsely stating that Unimed's Genucel® is a Panama-based product and that Genucel® is a new product with limited reviews. |
| YouTube Video | 09/16/16 | youtube.com/watch?v=EsZA0NDx9ts | Viva Aldridge, a third-party reviewer paid by Defendants, posts a video entitled "Genucel reviews and consumer product report," which links to buyerreview.com and its sham reviews that denigrate |

| | | | Unimed's Genucel® without disclosing the website's affiliation with Defendants and their products. |
|---|---|---|---|
| Online Review | 04/09/16 - 03/10/17 | skincreamsadvisor.com | Posts a sham rankings list that claimed 4 out of the 5 top creams for the eye area are Defendants' products, posts a sham rankings list that falsely claims to be a "comprehensive comparison" of neck creams and listed Defendants' products as number 1 and number 2; posts sham rankings deceptively claiming that Defendants' wrinkle creams were number 1 and number 2; misdirects Genucel® consumers with a paid placement SERP advertisement entitled "Don't Buy that Eye Cream" and that Defendants' products were top five products; falsely claims that Dermagist stimulates skin cell growth and boosts collagen and elastin to heal wrinkles; falsely claims that Eyevectin and Eyelighten are organic, vegan or "all natural"; and falsely represents the price of Unimed's Genucel®; Defendants never disclose that the website is controlled and operated by Defendants. |
| Consumer comment | 03/05/2017 | skinproductshopper.com | Sabrina Markin posts what purports to be a consumer comment, without disclosing her affiliation with Defendants, that if she paid $100 or more for Genucel®, she wouldn't be happy. |
| Online Review | 06/04/17 | beautyhealthtimes.com | An unaccredited review is entitled "Genucel Chamonix Esotique XV Reviews and Consumer Product Report," |

| | | | and deceptively states (among other things) "not as effective as our Top Pick Anti-Wrinkle Cream" and "there are a seemingly large number of negative reviews out there on the internet," and links to websites selling Defendants' "superior anti-wrinkle creams." |
|---|---|---|---|

138.    All of the wire communications described above crossed interstate and international borders by reason of the technology used to transmit the communications.

139.    Some or all of the communications described above have appeared and continue to appear on Defendants' website(s) since the date of their original posting.

140.    None of the communications described above disclose that the author is affiliated with Defendants, who are competitors of Unimed.

141.    Each and every use of the interstate wires described above was committed by Defendants with the specific intent to defraud Unimed (or its customers) or to defraud Defendants' other competitors in the skin care market (or their customers) or to obtain the property of Unimed customers or the customers of other competitors in the skin care market by means of false or fraudulent pretenses, representations, or promises.  Defendants' acts of wire fraud in violation of 18 U.S.C. § 1343 constitute racketeering activity as defined by 18 U.S.C. § 1961(1)(B).

142.    Defendants' scheme to defraud, as set forth above, violates Fla. 817.034(3)(d) and 4(a-b).

143.    Unimed's customers justifiably relied on Defendants' fraudulent representations and omissions made pursuant to the above-described scheme in that, among

other things, Defendants fraudulently and deceptively induced Unimed's customers to purchase Defendants' competing products rather than Unimed's products, resulting in loss sales to Unimed.

## False Advertising (Fla. Stat. §§ 817.06 and 817.41)

144.   As alleged with particularity above (paragraphs 19 – 94), the Individual Defendants, by and through each other and the Corporate Defendants, intended and continue to intend to sell merchandise directly or indirectly to the public and/or intended and continue to intend to increase consumption or use of their skin care products have made, published, disseminated, circulated, or placed before the public in the State of Florida (and elsewhere) advertisements regarding their merchandise that contain assertions, representations, and/or statements that are untrue, deceptive, or misleading in violation of Fla. Stat. 817.06.

145.   As alleged with particularity above (paragraphs 19 – 94), the Individual Defendants, by and through each other and the Corporate Defendants, have made or have disseminated or caused to be made or disseminated before the general public of the State of Florida (and elsewhere) misleading advertisements that are designed and intended to obtain money under false pretenses in violation of Fla. Stat. §§ 817.40(5) and 817.41.

146.   Defendants knew or through the exercise of reasonable care should have known or could have ascertained that the misleading advertisements described above (paragraphs 19 – 94) were untrue or misleading, and Defendants disseminated the misleading advertisements described above (paragraphs 19 – 94) with the intent or purpose, either directly or indirectly, to sell or dispose of Defendants' skin care products in violation of Fla. Stat. §§ 817.40(5) and 817.41.

147.   The misleading advertisements described above (paragraphs 19 – 94) were disseminated by Defendants, directly or indirectly, and made material misrepresentations and/or misleading statements of fact.

148.   Each Defendant knew or should have known of the falsity of the statements contained in the misleading advertisements.

149.   Each Defendant intended that the misrepresentations and misleading statements would induce consumers of skin care products to act on the misrepresentations or misleading statements.

150.   Unimed was injured when consumers of skin care products relied on the Defendants' misrepresentations or misleading statements to buy Defendants' products rather than Unimed's products and to the extent that Defendants' misrepresentations or misleading statements adversely affected the reputation of Unimed or its products.

## COUNT I

## LANHAM ACT

## (False Advertising)

## (Against All Defendants)

## 15 U.S.C. § 1125(a)

151.   Unimed realleges and restates paragraphs 1 through 130 as if fully set forth herein and further states:

152.   As alleged in paragraphs 19 – 94, Defendants individually and collectively have engaged in a concerted campaign of false and misleading material statements of fact in commercial advertising activities including the creation and use of sham "review" websites to promote the use and sale of the Defendants' skin care products by publishing

false and misleading consumer and expert product reviews and linking Defendants' sham reviews to other websites that sell Defendants' skin-care products.

153.    Defendants have no scientific data or research supporting the false and misleading sham "review" websites.

154.    Defendants knew or should have known that their commercial advertising activities were false, deceptive and misleading and that consumers were likely to be misled and deceived by Defendants' false and misleading commercial advertising activities both regarding Unimed's products and Defendants' products.

155.    Defendants have repeatedly and continuously posted false, deceptive and misleading statements of fact about their own products compared to Unimed's products to intentionally influence purchasing decisions and to divert sales from Unimed to the Defendants' websites.

156.    Defendants' false and misleading commercial advertising activities include false statements and material misrepresentations relating to false surveys, and false on-line product reviews that were willfully and intentionally designed to divert sales from Unimed to the Defendants' products and websites resulting in lost sales and injury to Unimed and others including consumers who were misled and deceived by Defendants' false advertising activities on the Internet and in foreign and interstate commerce.

157.    Defendants willfully and intentionally diverted consumers to their false and misleading commercial websites by several means, including but not limited to the deployment of false and misleading SEO campaigns, false and misleading YouTube videos, and other Internet activities deliberately and intentionally designed to falsely denigrate Unimed's products and falsely promote Defendants' products.

158.   Defendants' false and misleading material misrepresentations of fact are not limited to sham review sites. Defendants' false and misleading commercial advertising activities extend to blogs and social media posts that falsely appear to be published by neutral evaluators but are in fact posted by Defendants utilizing various aliases or posters secretly paid by Defendants to engage in false and misleading commercial advertising activities.

159.   Defendants also use, and continue to use, paid-placement programs, such as Google Adwords, to divert consumers searching for Unimed's products to sham review cites with false statements such as "Don't Buy that Eye Cream" which, when clicked, divert the consumers to sham review websites that denigrate Unimed's products and promote Defendants' products with links to purchase Defendants' falsely promoted products.

160.   Defendants individually and in concert have and continue to engage in a systematic and ongoing scheme to defraud, deceive, mislead consumers and to divert the sales of Unimed's skin care products to Defendants.

161.   Defendants' false and misleading representations of fact in commercial advertising activities have actually deceived consumers and continue to deceive and have the capacity to continue to deceive appreciable amounts of consumers.

162.   Defendants' false and misleading commercial advertising activities have and continue to have a material effect on purchasing decisions diverting sales to Defendants' products and injuring Unimed's brand recognition and products.

163.   Defendants' false and misleading representations of fact in commercial advertising activities have and continue to injure Unimed causing substantial damages to

Unimed including lower conversion rates and substantial lost sales. Defendants have actually deceived consumers and injured Unimed causing substantial damages to Unimed including lower conversion rates and substantial lost sales and substantially increased costs now required to combat and to help mitigate the false and misleading representations of fact in Defendants' commercial advertising activities.

164.    Defendants' material false and misleading advertising statements and material omissions injure both consumers and Unimed.

165.    Defendants' false and misleading advertising statements and omissions violate Section 43(a) of the Lanham Act, 15 U.S.C. Section 1125(a).

166.    Defendants have caused, and will continue to cause, immediate and irreparable injury to Unimed including injury to Unimed's business, reputation and goodwill, for which there is no adequate remedy at law.

167.    Unimed is entitled to an injunction under 15 U.S.C. Section 1116 restraining Defendants, and Defendants' officers, agents, employees, and representatives, and all other in active concert or participation with any of them, who receive actual notice, whether acting directly or indirectly, in the advertising and promotion of Defendants' products must cease and desist from engaging in future acts of false and misleading commercial advertising activities.

168.    Under 15 U.S.C. Section 1117, Unimed further may recover from Defendants the damages sustained by Unimed because of Defendants' acts in violation of 15 U.S.C. Section 1125(a).

169.    Under 15 U.S.C. Section 1117, Unimed further may recover from Defendants the gains, profits and advantages that Defendants obtained because of Defendants' action in violation of 15 U.S.C. Section 1125(a).

170.    Pursuant to 15 U.S.C. Section 1117, Unimed further may recover its costs.

171.    Defendants' wrongful actions in violation of 15 U.S.C. Section 1117 were undertaken willfully and intentionally to divert sales from Unimed to Defendants and to injure Unimed's brand recognition and products making this an exceptional case entitling Unimed to recover additional damages and reasonable attorney's fees under 15 U.S.C. Section 1117.

## COUNT II

### RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT
### (FEDERAL RICO)
### (Against Sabrina Markin, Bradley Markin, Lori Multz and Robert Markin)
### 18 U.S.C. § 1962(c)

172.    Unimed realleges and restates paragraphs 1 through 130 as if fully set forth herein and further states:

### (Defendant Persons / Enterprises)

173.    Sabrina Markin, Bradley Markin, Lori Multz, and Robert Markin constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that they are "a group of individuals associated in fact" (hereinafter referred to as the "Individual Enterprise").

  a.  Sabrina Markin, Bradley Markin, Lori Multz, and Robert Markin share the common purpose of (among other things) fraudulently and deceptively

46

marketing skin care products distributed by Dermagist, M2, and other companies owned or controlled by members of the Individual Enterprise and the common purpose of fraudulently inducing Unimed's customers (and other competitors' customers) to purchase products distributed by Dermagist, M2, and other companies owned or controlled by members of the Individual Enterprise.

b.  Sabrina Markin, Bradley Markin, Lori Multz, and Robert Markin are related in that they cooperatively market skin care products distributed by Dermagist, M2, and other companies owned or controlled by members of the Individual Enterprise and in that they own or control the Corporate Defendants.

c.  The Individual Enterprise possesses sufficient longevity for its members to carry out their purpose(s) in that the Individual Enterprise has operated since April 2014 (at a minimum), continues to operate, and continues to fraudulently induce Unimed's customers (and the customers of other competitors) to purchase products distributed by Dermagist, M2, and other companies owned or controlled by members of the Individual Enterprise.

Sabrina Markin, Bradley Markin, Lori Multz, and Robert Markin, are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of Individual Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).  Said pattern of racketeering activity consisted of, but was not limited to, the acts wire fraud (described in paragraphs 19-94 and 131-143).

174.   In the alternative to paragraph 173, Dermagist, M2, Marketing Americas and SBM constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that they are "a group of individuals associated in fact" (hereinafter referred to as the "Corporate Enterprise").

a. Dermagist, M2, Marketing Americas and SBM share the common purpose of (among other things) of fraudulently and deceptively marketing their skin care products and the common purpose of fraudulently inducing Unimed's customers (and other competitors' customers) to purchase products distributed by Dermagist and M2.

b. Dermagist, M2, Marketing Americas, and SBM are related in that they cooperatively market skin care products distributed by Dermagist and M2 and share (in whole or in part, directly or indirectly) common ownership.

c. The Corporate Enterprise possesses sufficient longevity for its members to carry out their purpose(s) in that the Corporate Enterprise has operated since April 2014 (at a minimum), continues to operate, and continues to fraudulently induce Unimed's customers (and the customers of other competitors) to purchase products distributed by the Corporate Enterprise.

Sabrina Markin, Bradley Markin, Lori Multz, and Robert Markin are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of the Corporate Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).  Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud (described in paragraphs 19-94 and 131-143).

175.    In the alternative to paragraphs 173 and 174, Dermagist, as a legal entity, constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c).  Sabrina Markin, Bradley Markin, Robert Markin, and Lori Multz are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of Dermagist through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).  Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud (described in paragraphs 19-94 and 131-143).

176.    In the alternative to paragraphs 173 through 175, M2, as a legal entity, constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c). Bradley Markin and Sabrina Markin are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed (directly or indirectly) the affairs of M2 through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).  Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud (described in paragraphs 19-94 and 131-143).

177.    In the alternative to paragraphs 173 through 176, Sabrina Markin, as an individual, constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c). Bradley Markin, Lori Multz, and Robert Markin, are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of Sabrina Markin through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).  Said

pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud (described in paragraphs 19-94 and 131-143).

178.    At all relevant times, the enterprises alleged in paragraphs 173 through 177 were engaged in, and their activities affected, interstate commerce and foreign commerce.

**(Pattern of Racketeering Activity)**

179.    All of the acts of racketeering described in paragraphs 19 – 94 and 131-143 were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that their common purpose was to defraud competitors (including Unimed) and their customers of money, their common result was to defraud competitors (including Unimed) and their customers of money; Sabrina Markin, Bradley Markin, Lori Multz, and Robert Markin, personally or through the Corporate Defendants, their agent or agents, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; Defendants' competitors (including Unimed) were the victims of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

180.    All of the acts of racketeering described in paragraphs 19-94 and 131-143 were continuous so as to form a pattern of racketeering activity in that Sabrina Markin, Bradley Markin, Lori Multz, and/or Robert Markin have engaged in the predicate acts since April 2014 (at a minimum) and/or the acts of racketeering threaten to continue indefinitely because the acts of racketeering are the regular way in which Sabrina Markin, Bradley Markin, Lori Multz, and Robert Markin do business in the skin care market and in other markets, such as the septic chemical market and the weight loss market (described in paragraphs 112-130).

181.   As a direct and proximate result of, and by reason of, the activities of Sabrina Markin, Bradley Markin, Lori Multz, and Robert Markin, and their conduct in violation of 18 U.S.C. § 1962(c), Unimed was injured in its business or property, within the meaning of 18 U.S.C. § 1964(c).   Among other things, Unimed suffered damages to the extent Unimed's customers were fraudulently induced to purchase Defendants' products rather than Unimed's products, to the extent that the brand image and trade name of Unimed (and its products and its conversion rate) has been adversely impacted by Defendants' false, deceptive, and defamatory statements, and to the extent Unimed has incurred increased costs of doing business.   Unimed is, therefore, entitled to recover threefold the damages sustained together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

182.   Pursuant to 18 U.S.C. § 1964(a), Defendants should be restrained from further violating 18 U.S.C. § 1962(c) and should disgorge all ill-gotten profits earned by their violation of 18 U.S.C. § 1962(c).

## COUNT III

## (FEDERAL RICO CONSPIRACY)

**(Against Sabrina Markin, Bradley Markin, Robert Markin, Lori Multz and John Catalfamo)**

### 18 U.S.C. § 1962(d)

183.   Unimed realleges and restates paragraphs 1 through 130 as if fully set forth herein and further states:

184.   As alleged in Count II, one or more of the following individuals violated 18 U.S.C. § 1962(c): Sabrina Markin, Bradley Markin, Robert Markin, and/or Lori Multz.

Any person(s) who is found to have violated 18 U.S.C. § 1962(c) is hereafter referred to as the "Operator / Manager" for the remainder of this Count.

185.    Sabrina Markin, Bradley Markin, Robert Markin, Lori Multz, and/or John Catalfamo conspired with the Operator / Manager(s) to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*see* ¶¶ 173-177) through a pattern of racketeering activity (*see* ¶¶ 19-94, 131-143) in violation of 18 U.S.C. § 1962(d). In particular, Sabrina Markin, Bradley Markin, Robert Markin, Lori Multz or John Catalfamo intended to or agreed to further an endeavor of the Operator / Manager(s) which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c)) and adopted the goal of furthering or facilitating the criminal endeavor.

186.    Unimed was injured by Sabrina Markin's, Bradley Markin's, Robert Markin's, Lori Multz's, and/or John Catalfamo's overt acts that are acts of racketeering or otherwise unlawful under the RICO statute, which included (among other acts) acts of wire fraud (as described in paragraphs 19-94 and 131-143) committed through the enterprises alleged in Count II.

187.    As a direct and proximate result of, and by reason of, the activities of the Sabrina Markin, Bradley Markin, Robert Markin, Lori Multz, and/or John Catalfamo, and their conduct in violation of 18 U.S.C. § 1962(c), Unimed was injured in its business or property, within the meaning of 18 U.S.C. § 1964(c).  Among other things, Unimed suffered damages to the extent Unimed's customers were fraudulently induced to purchase Defendants' products rather than Unimed's products, to the extent that the brand image and trade name of Unimed (and its products and its conversion rate) has been adversely

impacted by Defendants' false, deceptive, and defamatory statements, and to the extent Unimed has incurred increased costs of doing business.  Unimed is, therefore, entitled to recover threefold the damages sustained together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

188.    Pursuant to 18 U.S.C. § 1964(a), Defendants should be restrained from further violating 18 U.S.C. § 1962(c) and should disgorge all ill-gotten profits earned by their violation of 18 U.S.C. § 1962(c).

<u>COUNT IV</u>

**RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT**

**(FEDERAL RICO)**

**(Against Dermagist, SBM and M2)**

**18 U.S.C. § 1962(c)**

189.    Unimed realleges and restates paragraphs 1 through 130 as if fully set forth herein and further states:

**(Defendant Persons / Enterprises)**

190.    Dermagist, M2, Marketing Americas and SBM constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that they are "a group of individuals associated in fact" (hereinafter referred to as the "Corporate Enterprise").

a.   Dermagist, M2, Marketing Americas and SBM share the common purpose of (among other things) of fraudulently and deceptively marketing their skin care products and the common purpose of fraudulently inducing Unimed's customers (and other competitors' customers) to purchase products distributed by Dermagist and M2.

b. Dermagist, M2, Marketing Americas, and SBM are related in that they cooperatively market skin care products distributed by Dermagist and M2 and share (in whole or in part, directly or indirectly) common ownership.

c. The Corporate Enterprise possesses sufficient longevity for its members to carry out their purpose(s) in that the Corporate Enterprise has operated since April 2014 (at a minimum), continues to operate, and continues to fraudulently induce Unimed's customers (and the customers of other competitors) to purchase products distributed by the Corporate Enterprise.

Dermagist, M2, and SBM are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of the Corporate Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud (described in paragraphs 19-94 and 131-143).

191.    In the alternative to paragraph 190, Marketing Americas, as a legal entity, constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c). Dermagist, M2 and SBM are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of Marketing Americas through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).   Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud (described in paragraphs 19-94 and 131-143).

192.    In the alternative to paragraphs 190 and 191, M2, as a legal entity, constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c).  SBM is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who conducted, participated in, engaged in, and operated and managed the affairs of M2 through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).  Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud (described in paragraphs 19-94 and 131-143).

193.    At all relevant times, the enterprises alleged in paragraphs 190 through 192 were engaged in, and their activities affected, interstate commerce and foreign commerce.

## (Pattern of Racketeering Activity)

194.    All of the acts of racketeering described in paragraphs 19 – 94 and 131-143 were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that their common purpose was to defraud competitors (including Unimed) and their customers of money, their common result was to defraud competitors (including Unimed) and their customers of money; M2, Dermagist and SBM, through their officers, agents, and employees, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; Defendants' competitors (including Unimed) were the victims of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

195.    All of the acts of racketeering described in paragraphs 19-94 and 131-143 were continuous so as to form a pattern of racketeering activity in that Dermagist, M2 and SBM have engaged in the predicate acts since April 2014 (at a minimum) and/or the acts of

racketeering threaten to continue indefinitely because the acts of racketeering are the regular way in which Dermagist, M2 and SBM do business in the skin care market.

196.    As a direct and proximate result of, and by reason of, the activities of Dermagist, M2 and SBM, and their conduct in violation of 18 U.S.C. § 1962(c), Unimed was injured in its business or property, within the meaning of 18 U.S.C. § 1964(c).  Among other things, Unimed suffered damages to the extent Unimed's customers were fraudulently induced to purchase Defendants' products rather than Unimed's products, to the extent that the brand image and trade name of Unimed (and its products and its conversion rate) has been adversely impacted by Defendants' false, deceptive, and defamatory statements, and to the extent Unimed has incurred increased costs of doing business.  Unimed is, therefore, entitled to recover threefold the damages sustained together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

197.    Pursuant to 18 U.S.C. § 1964(a), Defendants should be restrained from further violating 18 U.S.C. § 1962(c) and should disgorge all ill-gotten profits earned by their violation of 18 U.S.C. § 1962(c).

## COUNT V

## (FEDERAL RICO CONSPIRACY)

## (Against Dermagist, M2, SBM and John Catalfamo)

## U.S.C. § 1962(d)

198.    Unimed realleges and restates paragraphs 1 through 130 as if fully set forth herein and further states:

199.    As alleged in Count IV, one or more of the following individuals violated 18 U.S.C. § 1962(c): Dermagist, M2 or SBM.  Any person(s) who is found to have

violated 18 U.S.C. § 1962(c) is hereafter referred to as the "Operator / Manager" for the remainder of this Count.

200.    Dermagist, M2, SBM and/or John Catalfamo conspired with the Operator / Manager(s) to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*see* ¶¶ 190-192) through a pattern of racketeering activity (*see* ¶¶ 19-94, 131-143) in violation of 18 U.S.C. § 1962(d). In particular, Dermagist, M2, SBM or John Catalfamo intended to or agreed to further an endeavor of the Operator / Manager(s) which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c)) and adopted the goal of furthering or facilitating the criminal endeavor.

201.    Unimed was injured by Dermagist's, M2's, SBM's and/or John Catalfamo's overt acts that are acts of racketeering or otherwise unlawful under the RICO statute, which included (among other acts) acts of wire fraud (as described in paragraphs 19-94 and 131-143) committed through the enterprises alleged in Count IV.

202.    As a direct and proximate result of, and by reason of, the activities of the Dermagist, M2, SBM and/or John Catalfamo, and their conduct in violation of 18 U.S.C. § 1962(c), Unimed was injured in its business or property, within the meaning of 18 U.S.C. § 1964(c).   Among other things, Unimed suffered damages to the extent Unimed's customers were fraudulently induced to purchase Defendants' products rather than Unimed's products, to the extent that the brand image and trade name of Unimed (and its products and its conversion rate) has been adversely impacted by Defendants' false, deceptive, and defamatory statements, and to the extent Unimed has incurred increased costs of doing business.   Unimed is, therefore, entitled to recover threefold the damages sustained

together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

203.    Pursuant to 18 U.S.C. § 1964(a), Defendants should be restrained from further violating 18 U.S.C. § 1962(c) and should disgorge all ill-gotten profits earned by their violation of 18 U.S.C. § 1962(c).

## COUNT VI

### (FLORIDA CIVIL REMEDIES FOR CRIMINAL PRACTICES)

### (Against Sabrina Markin, Bradley Markin, Robert Markin, and Lori Multz)

### Fla. Stat. §§ 772.103(3), 772.104(1)

204.    Unimed realleges and restates paragraphs 1 through 130 as if fully set forth herein and further states:

205.    Sabrina Markin, Bradley Markin, Robert Markin, and Lori Multz constituted an "enterprise," within the meaning of Fla. Stat. §§ 772.102(3) and 772.103(3), in that they are "a group of individuals associated in fact" (hereinafter referred to as the "Individual Enterprise").

  a. Sabrina Markin, Bradley Markin, Robert Markin, and Lori Multz share the common purpose of (among other things) fraudulently and deceptively marketing skin care products distributed by Dermagist, M2, and other companies owned or controlled by members of the Individual Enterprise and the common purpose of fraudulently inducing Unimed's customers (and other competitors' customers) to purchase products distributed by Dermagist, M2, and other companies owned or controlled by members of the Individual Enterprise.

    b.   Sabrina Markin, Bradley Markin, Robert Markin, and Lori Multz are related in that they cooperatively market skin care products distributed by Dermagist, M2, and other companies owned or controlled by members of the Individual Enterprise and in that they own or control the Corporate Defendants.

    c.   The Individual Enterprise possesses sufficient longevity for its members to carry out their purpose(s) in that the Individual Enterprise has operated since April 2014 (at a minimum), continues to operate, and continues to fraudulently induce Unimed's customers (and the customers of other competitors) to purchase products distributed by Dermagist, M2, and other companies owned or controlled by members of the Individual Enterprise.

Sabrina Markin, Bradley Markin, Robert Markin, and Lori Multz are each a "person," within the meaning of Fla. Stat. § 772.103(3), who individually conducted, participated in, engaged in, and operated and managed the affairs of Individual Enterprise through a pattern of criminal activity within the meaning of Fla. Stat. § 772.102(4).  Said pattern of criminal activity consisted of, but was not limited to, the scheme to defraud and false advertising (described in paragraphs 19-94, 131-150).

220.    In the alternative to paragraph 205, Dermagist, M2, Marketing Americas and SBM constituted an "enterprise," within the meaning of Fla. Stat. §§ 772.102(3) and 772.103(3), in that they were "a group of individuals associated in fact" (hereinafter referred to as the "Corporate Enterprise").

    a.   Dermagist, M2, Marketing Americas and SBM share the common purpose of (among other things) fraudulently and deceptively marketing their skin care

products and the common purpose of fraudulently inducing Unimed's customers (and other competitors' customers) to purchase products distributed by Dermagist and M2.

b. Dermagist, M2, Marketing Americas, and SBM are related in that they cooperatively market skin care products distributed by Dermagist and M2 and share (in whole or in part, directly or indirectly) common ownership.

c. The Corporate Enterprise possesses sufficient longevity for its members to carry out their purpose(s) in that the Corporate Enterprise has operated since April 2014 (at a minimum), continues to operate, and continues to fraudulently induce Unimed's customers (and the customers of other competitors) to purchase products distributed by the Corporate Enterprise.

Sabrina Markin, Bradley Markin, Robert Markin, and Lori Multz are each a "person," within the meaning of Fla. Stat. § 772.103(3), who individually conducted, participated in, engaged in, and operated and managed the affairs of the Corporate Enterprise through a pattern of criminal activity within the meaning of Fla. Stat. 772.102(4).  Said pattern of criminal activity consisted of, but was not limited to, the scheme to defraud and false advertising (described in paragraphs 19-94, 131-150).

221.    In the alternative to paragraphs 205 and 206, Dermagist, as a legal entity, constituted an "enterprise," within the meaning of Fla. Stat. §§ 772.102(3) and 772.103(3). Sabrina Markin, Bradley Markin, Robert Markin, and Lori Multz are each a "person," within the meaning of Fla. Stat. § 772.103(3), who individually conducted, participated in, engaged in, and operated and managed the affairs of Dermagist through a pattern of criminal activity within the meaning of Fla. Stat. 772.102(4).  Said pattern of criminal activity

consisted of, but was not limited to, the scheme to defraud and false advertising (described in paragraphs 19-94, 131-150).

222.    In the alternative to paragraphs 205 through 207, M2, as a legal entity, constituted an "enterprise," within the meaning of Fla. Stat. §§ 772.102(3) and 772.103(3). Bradley Markin and Sabrina Markin are each a "person," within the meaning of Fla. Stat. § 772.103(3), who individually conducted, participated in, engaged in, and operated and managed (directly or indirectly) the affairs of M2 through a pattern of criminal activity within the meaning of Fla. Stat. 772.102(4). Said pattern of criminal activity consisted of, but was not limited to, the scheme to defraud and false advertising (described in paragraphs 19-94, 131-150).

223.    In the alternative to paragraphs 205 through 208, Sabrina Markin, as an individual, constituted an "enterprise," within the meaning of Fla. Stat. §§ 772.102(3) and 772.103(3). Bradley Markin, Robert Markin, and Lori Multz are each a "person," within the meaning of Fla. Stat. § 772.103(3), who individually conducted, participated in, engaged in, and operated and managed the affairs of Sabrina Markin through a pattern of criminal activity within the meaning of Fla. Stat. 772.102(4). Said pattern of criminal activity consisted of, but was not limited to, the scheme to defraud and false advertising (described in paragraphs 19-94, 131-150).

**(Pattern of Criminal Activity)**

225.    All of the criminal acts described in paragraphs 19-94 and 131-150 were related so as to establish a pattern of criminal activity, within the meaning of Fla. Stat. 772.102(4), in that their common intent and purpose was to defraud competitors (including Unimed) and their customers of money, their common result was to defraud competitors

(including Unimed) and their customers of money; Sabrina Markin, Bradley Markin, Robert Markin, and Lori Multz, personally or through the Corporate Defendants, their agent or agents, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; Defendants' competitors (including Unimed) were the victims of the criminal acts; and/or the criminal acts were otherwise interrelated by distinguishing characteristics and were not isolated events.

226.    All of the criminal acts described in paragraphs 19-94 and 131-150 occurred within the five-year prior preceding the filing of this complaint in that Sabrina Markin, Bradley Markin, Robert Markin, and/or Lori Multz have engaged in the criminal acts since April 2014 (at a minimum). Sabrina Markin, Bradley Markin, Robert Markin, and Lori Multz's criminal acts further threaten to continue indefinitely because the criminal acts are the regular way in which Sabrina Markin, Bradley Markin, Robert Markin, and Lori Multz do business in the skin care market and in other markets, such as the septic chemical market and the weight loss market (described in paragraphs 112-130).

227.    As a direct and proximate result of, and by reason of, the criminal activities of Sabrina Markin, Bradley Markin, Robert Markin, and Lori Multz, and their conduct in violation of Fla. Stat. § 772.103(3), clear and convincing evidence will establish that Unimed has been injured by reason of Defendants' violation of Fla. Stat. § 772.103, within the meaning of Fla. Stat. § 772.104(1).  Among other things, Unimed suffered damages to the extent Unimed's customers were fraudulently induced to purchase Defendants' products rather than Unimed's products, to the extent that the brand image and trade name of Unimed (and its products and its conversion rate) has been adversely impacted by Defendants' false, deceptive, and defamatory statements, and to the extent that Unimed has incurred increased

costs of doing business.   Unimed is, therefore, entitled to recover threefold the damages sustained together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

## COUNT VII

### (FLORIDA CIVIL REMEDIES FOR
### CRIMINAL PRACTICES CONSPIRACY)

### (Against Sabrina Markin, Bradley Markin, Robert Markin, Lori Multz, and John Catalfamo)

### Fla. Stat. §§ 772.103(4), 772.104(1)

228.   Unimed realleges and restates paragraphs 1 through 130 as if fully set forth herein and further states:

229.   As alleged in Count VI, one or more of the following individuals violated Fla. Stat. § 772.103(3): Sabrina Markin, Bradley Markin, Robert Markin, and/or Lori Multz.  Any person(s) who is found to have violated Fla. Stat. § 772.103(3) is hereafter referred to as the "Operator / Manager" for the remainder of this Count.

230.   Sabrina Markin, Bradley Markin, Robert Markin, Lori Multz, and/or John Catalfamo conspired with the Operator / Manager(s) to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*see* ¶¶ 205-209) through a pattern of criminal activity (*see* ¶¶ 19-94, 131-150) in violation of Fla. Stat. § 772.103(4). In particular, Sabrina Markin, Bradley Markin, Robert Markin, Lori Multz, and/or John Catalfamo intended to or agreed to further an endeavor of the Operator / Manager(s) which, if completed, would satisfy all of the elements of a substantive criminal offense under Fla. Stat. § 772.103(3) and adopted the goal of furthering or facilitating the criminal endeavor.

231.     Unimed was injured by Sabrina Markin's, Bradley Markin's, Robert Markin's, Lori Multz's, and/or John Catalfamo's overt criminal acts or are otherwise unlawful under Fla. Stat. § 772.101, *et seq.*, which included (among other acts) the scheme to defraud and false advertising (as described in paragraphs 19-94 and 131-150) committed through the enterprises alleged in Count IV.

232.     As a direct and proximate result of, and by reason of, the criminal activities of Sabrina Markin, Bradley Markin, Robert Markin, Lori Multz, and/or John Catalfamo, and their conduct in violation of Fla. Stat. § 772.103(4), clear and convincing evidence will establish that Unimed has been injured by reason of Defendants' violation of Fla. Stat. § 772.103, within the meaning of Fla. Stat. § 772.104(1).   Among other things, Unimed suffered damages to the extent Unimed's customers were fraudulently induced to purchase Defendants' products rather than Unimed's products, to the extent that the brand image and trade name of Unimed (and its products and its conversion rate) has been adversely impacted by Defendants' false, deceptive, and defamatory statements, and to the extent that Unimed has incurred increased costs of doing business.   Unimed is, therefore, entitled to recover threefold the damages sustained together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

<u>**COUNT VIII**</u>

**(FLORIDA CIVIL REMEDIES FOR CRIMINAL PRACTICES)**

**(Against Dermagist, M2 and SBM)**

**Fla. Stat. §§ 772.103(3), 772.104(1)**

233.     Unimed realleges and restates paragraphs 1 through 130 as if fully set forth herein and further states:

234.     Dermagist, M2, Marketing Americas and SBM constituted an "enterprise," within the meaning of Fla. Stat. §§ 772.102(3) and 772.103(3), in that they were "a group of individuals associated in fact" (hereinafter referred to as the "Corporate Enterprise").

a.   Dermagist, M2, Marketing Americas and SBM share the common purpose of (among other things) fraudulently and deceptively marketing their skin care products and the common purpose of fraudulently inducing Unimed's customers (and other competitors' customers) to purchase products distributed by Dermagist and M2.

b.   Dermagist, M2, Marketing Americas, and SBM are related in that they cooperatively market skin care products distributed by Dermagist and M2 and share (in whole or in part, directly or indirectly) common ownership.

c.   The Corporate Enterprise possesses sufficient longevity for its members to carry out their purpose(s) in that the Corporate Enterprise has operated since April 2014 (at a minimum), continues to operate, and continues to fraudulently induce Unimed's customers (and the customers of other competitors) to purchase products distributed by the Corporate Enterprise.

Dermagist, M2 and SBM are each a "person," within the meaning of Fla. Stat. § 772.103(3), who individually conducted, participated in, engaged in, and operated and managed the affairs of the Corporate Enterprise through a pattern of criminal activity within the meaning of Fla. Stat. 772.102(4).  Said pattern of criminal activity consisted of, but was not limited to, the scheme to defraud and false advertising (described in paragraphs 19-94, 131-150).

235.     In the alternative to paragraph 234, Marketing Americas, as a legal entity, constituted an "enterprise," within the meaning of Fla. Stat. §§ 772.102(3) and 772.103(3). Dermagist, M2 and SBM are each a "person," within the meaning of Fla. Stat. § 772.103(3), who individually conducted, participated in, engaged in, and operated and managed the affairs of Marketing Americas through a pattern of criminal activity within the meaning of Fla. Stat. 772.102(4).  Said pattern of criminal activity consisted of, but was not limited to, the scheme to defraud and false advertising (described in paragraphs 19-94, 131-150).

236.     In the alternative to paragraphs 234 and 235, M2, as a legal entity, constituted an "enterprise," within the meaning of Fla. Stat. §§ 772.102(3) and 772.103(3). SBM is a "person," within the meaning of Fla. Stat. § 772.103(3), who individually conducted, participated in, engaged in, and operated and managed (directly or indirectly) the affairs of M2 through a pattern of criminal activity within the meaning of Fla. Stat. 772.102(4). Said pattern of criminal activity consisted of, but was not limited to, the scheme to defraud and false advertising (described in paragraphs 19-94, 131-150).

**(Pattern of Criminal Activity)**

237.     All of the criminal acts described in paragraphs 19-94 and 131-150 were related so as to establish a pattern of criminal activity, within the meaning of Fla. Stat. 772.102(4), in that their common intent and purpose was to defraud competitors (including Unimed) and their customers of money, their common result was to defraud competitors (including Unimed) and their customers of money; Dermagist, M2 and SBM, through their officers, agents, and employees, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; Defendants' competitors (including

Unimed) were the victims of the criminal acts; and/or the criminal acts were otherwise interrelated by distinguishing characteristics and were not isolated events.

238.    All of the criminal acts described in paragraphs 19-94 and 131-150 occurred within the five-year prior preceding the filing of this complaint in that Dermagist, M2 and SBM have engaged in the criminal acts since April 2014 (at a minimum). Dermagist, M2 and SBM's criminal acts further threaten to continue indefinitely because the criminal acts are the regular way in which Dermagist, M2 and SBM do business in the skin care market.

239.    As a direct and proximate result of, and by reason of, the criminal activities of Dermagist, M2 and SBM, and their conduct in violation of Fla. Stat. § 772.103(3), clear and convincing evidence will establish that Unimed has been injured by reason of Defendants' violation of Fla. Stat. § 772.103, within the meaning of Fla. Stat. § 772.104(1). Among other things, Unimed suffered damages to the extent Unimed's customers were fraudulently induced to purchase Defendants' products rather than Unimed's products, to the extent that the brand image and trade name of Unimed (and its products and its conversion rate) has been adversely impacted by Defendants' false, deceptive, and defamatory statements, and to the extent that Unimed has incurred increased costs of doing business.  Unimed is, therefore, entitled to recover threefold the damages sustained together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

## COUNT IX

## (FLORIDA CIVIL REMEDIES FOR
## CRIMINAL PRACTICES CONSPIRACY)

### (Against M2, Dermagist, SBM and John Catalfamo)

### Fla. Stat. §§ 772.103(4), 772.104(1)

240.    Unimed realleges and restates paragraphs 1 through 130 as if fully set forth herein and further states:

241.    As alleged in Count VIII, one or more of the following individuals violated Fla. Stat. § 772.103(3): M2, Dermagist, or SBM.  Any person(s) who is found to have violated Fla. Stat. § 772.103(3) is hereafter referred to as the "Operator / Manager" for the remainder of this Count.

235.    M2, Dermagist, SBM, and/or John Catalfamo conspired with the Operator / Manager(s) to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*see* ¶¶ 234-236) through a pattern of criminal activity (*see* ¶¶ 19-94, 131-150) in violation of Fla. Stat. § 772.103(4). In particular, M2, Dermagist, SBM, and/or John Catalfamo intended to or agreed to further an endeavor of the Operator / Manager(s) which, if completed, would satisfy all of the elements of a substantive criminal offense under Fla. Stat. § 772.103(3) and adopted the goal of furthering or facilitating the criminal endeavor.

236.    Unimed was injured by M2's, Dermagist's, SBM's, and/or John Catalfamo's overt criminal acts or are otherwise unlawful under Fla. Stat. § 772.101, *et seq.*, which included (among other acts) the scheme to defraud and false advertising (as described in paragraphs 19-94 and 131-150) committed through the enterprises alleged in Count IV.

237.     As a direct and proximate result of, and by reason of, the criminal activities of M2, Dermagist, SBM, and/or John Catalfamo, and their conduct in violation of Fla. Stat. § 772.103(4), clear and convincing evidence will establish that Unimed has been injured by reason of Defendants' violation of Fla. Stat. § 772.103, within the meaning of Fla. Stat. § 772.104(1).   Among other things, Unimed suffered damages to the extent Unimed's customers were fraudulently induced to purchase Defendants' products rather than Unimed's products, to the extent that the brand image and trade name of Unimed (and its products and its conversion rate) has been adversely impacted by Defendants' false, deceptive, and defamatory statements, and to the extent that Unimed has incurred increased costs of doing business.   Unimed is, therefore, entitled to recover threefold the damages sustained together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

## COUNT X

### (VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUPTA"))

### (Against All Defendants)

### Fla. Stat. §§ 501.201-213

238.     Unimed realleges and restates paragraphs 1 through 130 as if fully set forth herein and further states:

239.     This is a claim for deceptive and unfair trade practices against Defendants brought pursuant to Fla. Stat. § 501.201 et. seq.

240.     Unimed, as a company engaging in commerce and trade in Florida and as a legitimate competitor of Defendants, is entitled to the protection of said statute from

those who engage in unfair methods of competition or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce. Fla. Stat. § 501.202(2).

241.   The definition of "trade or commerce" under FDUPTA means "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good," such as "the advertising, soliciting, providing, offering, or distributing" of Defendants' goods as described above.

242.   A violation of FDUPTA may be based upon "any law, statute, rule, regulation, or ordinance which proscribes unfair, deceptive, or unconscionable acts or practices." Fla. Stat. § 501.203(3)(c).

243.   Like FDUPTA, the aforementioned causes of action are designed to protect the consuming public from those who engage in unfair, deceptive, or unconscionable acts while rendering services.

244.   As described in paragraphs 19-94, Defendants engaged in unconscionable acts and/or practices, and unfair and/or deceptive acts and/or practices, in trade and/or commerce, including but not limited to material misrepresentations of facts to the public, while knowing of their falsity, with the intent to receive profits for their own gain while inducing consumers, including Unimed, to believe that: Defendants had expertise in the field and/or performed expert analysis on the competing products; the reviews posted were from third party and/or uninterested persons, when in reality they were posted directly by Defendants and/or their agents; the information contained within Defendants' websites and press releases were accurate, when in reality they provided false information regarding Unimed's products and the products of other competitors, amongst others, in violation of Fla. Stat. § 501.204.

245.    Defendants' actions in trade and commerce constitute unfair and/or deceptive acts or practices under Florida's Deceptive and Unfair Trade Practices Act., § 501.201 et. seq.

246.    Defendants are, therefore in violation of FDUPTA, giving rise to a civil cause of action under which Unimed is entitled to relief.

247.    As a direct and proximate result of Defendants' aforementioned misconduct, Unimed has suffered damages.

## COUNT XI

## (VIOLATION OF MISLEADING ADVERTISTEMENT STATUTE)

### (Against All Defendants)

### Fla. Stat. § 817.41

248.    Unimed realleges and restates paragraphs 1 through 130 as if fully set forth herein and further states:

249.    This is a claim for misleading advertisement against Defendants brought pursuant to Fla. Stat. § 817.41.

250.    Unimed, as a competitor of Defendants, is entitled to "stand-in" for a consumer under Fla. Stat. § 817.41. *Third Party Verification, Inc. v. Signaturelink, Inc.*, 492 F. Supp.2d 1314, 1322-23 (M.D. Fla. 2007).

251.    As set forth above (paragraphs 19-94), Defendants made misrepresentations of material fact. In particular, Defendants' represented their product reviews were unbiased, based on expert evaluation, or otherwise objective.

252.    Defendants knew or should have known the falsity of their statements.

253.    Defendants intended that their misrepresentations would induce the consuming public to rely and act on the misrepresentations.

254.    Unimed was injured as a direct and proximate result of Defendants' representations.

## COUNT XII

## (COMMON LAW FRAUD)

### (Against All Defendants)

255.    Unimed realleges and restates paragraphs 1 through 130 as if fully set forth herein and further states:

256.    As set forth above (paragraphs 19-94), Defendants have made false statements of material fact, including but not limited to their sham product reviews, intentionally misrepresenting cost price, quantity of product per price point, as stated forth herein.

257.    At the time that they made the statements, Defendants knew that the statements were false and misleading.

258.    Defendants made their false statements with the intent that others would act upon them, and purchase their products over and above Unimed products.

259.    As a direct and proximate result of Defendants' actions, Unimed has suffered damages.

## COUNT XIII

## (DEFAMATION)

### (Against All Defendants)

260.    Unimed realleges and restates paragraphs 1 through 130 as if fully set forth herein and further states:

261.    As set forth above (paragraphs 19-94), Defendants published defamatory and false product reviews and rankings regarding Unimed's products.

262.    Defendants' false product reviews and rankings were published to the public.

263.    As a direct and proximate result of Defendants' defamatory and false publications, Unimed has suffered damages.

## COUNT XIV

## (INJURIOUS FALSEHOOD)

### (Against All Defendants)

264.    Unimed realleges and restates paragraphs 1 through 130 as if fully set forth herein and further states:

265.    As set forth above (paragraphs 19-94), Defendants made false and defamatory statements and have published same to third parties via their aforementioned false product review websites and videos.

266.    As a direct and proximate result of Defendants' defamatory and false publications, Unimed has suffered damages.

## COUNT XV

## (TORTIOUS INTERFERENCE WITH ADVANTAGEOUS RELATIONSHIPS)

### (Against All Defendants)

267.    Unimed realleges and restates paragraphs 1 through 130 as if fully set forth herein and further states:

268.    By virtue of the fact that the Defendants' false product review websites and videos specifically targeting Unimed's products, Defendants are well aware of Unimed, and Unimed's products in the market.

269.    Defendants have engaged in a practice to specifically deter prospective consumers from purchasing Unimed's products and have provided false and defamatory information via false product review and websites and videos to steer Unimed's consumers to Defendants.

270.    As a result of Defendants intentional and unjustifiable actions, Unimed has suffered damages.

**WHEREFORE**, Unimed prays that the Court:

1.    Enter judgment against Defendants for all actual damages sustained by Unimed;

2.    Enter judgment against Defendants for treble Unimed's actual damage award pursuant to 18 U.S.C. § 1964(c) and Fla. Stat. § 772.104(1);

3.    Enter judgment against Defendants for Unimed's reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c), Fla. Stat. §§ 501.2105(1), 501.211(2), Fla. Stat. § 772.104(1) and/or Fla. Stat. § 817.41(6);

4.      Enter an order restraining Defendants from further violating 18 U.S.C. § 1962(c) and disgorging all ill-gotten profits earned by Defendants in violation of 18 U.S.C. § 1962(c) pursuant to 19 U.S.C. § 1964(a) and/or Fla. Stat. §501.211;

5.      Enter judgment awarding to Unimed for all interest allowed by law; and

6.      Award Unimed such other and further relief as the Court deems just and appropriate.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Unimed hereby demands a trial by jury on all issues triable by jury.

February 9, 2018                                    /s/ Anthony G. Franqui
                                                   Anthony G. Franqui
                                                   FBN: 0543535
                                                   **FRANQUI TOTTEN, LLP**
                                                   Brickell Bayview Center
                                                   80 S.W. 8th Street, Suite 2000
                                                   Miami, FL 33130
                                                   Tel: (305) 423-7011
                                                   Fax: (305) 470-7433
                                                   tony@ftlawgroup.com

                                                   Jeffrey E. Grell
                                                   *Pending Pro Hac Vice Admission*
                                                   **GRELL FEIST PLC**
                                                   825 Nicollet Mall, Suite 625
                                                   Minneapolis, MN 55402
                                                   (612) 353-5530
                                                   (612) 354-7230 (fax)
                                                   jgrell@grellfeist.com

                                                   R. Mark Halligan
                                                   *Pending Pro Hac Vice Admission*
                                                   **FISHERBROYLES, LLP**
                                                   203 North LaSalle Street, Suite 2100
                                                   Chicago, IL 60601
                                                   Tel:  312-607-0102
                                                   rmark.halligan@fisherbroyles.com

Sophia M. Shalaby
*Pending Pro Hac Vice Admission*
**LAW OFFICES OF SOPHIA M.
SHALABY**
581 Main Street, Suite 640
Woodbridge, NJ 07095
Tel: (732) 791-4141
Fax: (732) 348-3070
sophia@shalaby-law.com


**ATTORNEYS FOR PLAINTIFF
UNIMED INTERNATIONAL INC.**